**In the United States District Court
for the District of Kansas**

———————

Case No. 19-cv-02305-TC-GEB

———————

LETICIA MACIAS, ET AL.,

*Plaintiffs*

v.

BNSF RAILWAY COMPANY, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

Plaintiffs assert trespass, negligence, and nuisance claims against Defendants for water damage to their homes in connection with local flooding during a series of significant storms. Doc. 140. Plaintiffs now move to certify a putative class. Doc. 226. For the following reasons, Plaintiffs' motion is denied.

**I**

**A**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). To meet that exception, "a party seeking to maintain a class action must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Id.* (citation and internal quotation marks omitted).

Rule 23 "does not set forth a mere pleading standard." *Comcast*, 569 U.S. at 33 (citation omitted). A plaintiff requesting class certification "must be prepared to prove . . . *in fact*" that each requirement is met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). That may require a court to "'probe behind the pleadings' and examine the facts and evidence in the case." *Tabor v. Hilti, Inc.*, 703 F.3d 1206,

1

1227–28 (10th Cir. 2013) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1960–61 (2021). Even so, consideration of the merits on a motion for class certification is limited to "determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Rule 23(a) delineates four prerequisites a movant must show to merit certification: numerosity, commonality, typicality, and adequate representation. Fed. R. Civ. P. 23(a). Certification is proper only if a district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 569 U.S. at 33 (citation omitted); *Wal-Mart*, 564 U.S. at 350–51. If those are met, a movant must then "satisfy through evidentiary proof" at least one of the defined classes under Rule 23(b). *Comcast*, 569 U.S. at 33.

Related to the Rule 23(a) analysis, a plaintiff's proposed class must be properly defined. The definition of a class is essential to certification, as it identifies who is entitled to relief, bound by a final judgment, and entitled to notice. *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 444 (D. Kan. 2006) (citing *Manual for Complex Litigation* § 21.222, at 270 (4th ed. 2005)). It "must be precise, objective, and presently ascertainable." *Id.* at 445 (citing *Manual for Complex Litigation* § 21.222, at 270). Although there is no requirement at the certification stage to show that each and every putative member sustained an injury, a putative class may be denied certification if enough of its members could not have been injured by a defendant's alleged conduct. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824–25 (7th Cir. 2012); *see also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).

**B**

This suit consists of several land tort claims against Defendants, including trespass, public and private nuisance, negligence, and an additional claim for inverse condemnation against Defendant Unified Government, all arising from four floods. Doc. 140 at ¶¶ 24–29. Plaintiffs allege that the acts or omissions of each Defendant caused the flooding on their properties. Doc. 140 at ¶¶ 33, 35–36, 45–46.

The Kansas City metro area experienced heavy rains in the summer of 2017. *See* Doc. 238-2 at 4; Doc. 238 at 9 n.1; Doc. 209 at 3.[1] The Argentine Neighborhood of Kansas City, Kansas, situated close to the southern bank of the Kansas River, experienced four substantial floods during July and August 2017. Doc. 140 at ¶¶ 26–27; Doc. 238 at 7. Each flood infiltrated numerous residential properties and caused mild to significant damage. Doc. 140 at ¶ 26.

Plaintiffs Leticia Macias, Elizabeth Magana Zamora, San Juanita Schneider, Juan Garcia, and Timothy Curry are residents of the Argentine Neighborhood. Doc. 140 at ¶ 18. Each sustained property damage during one or more of the floods. *See id.* at ¶ 26. Defendants Miles Leasing Company and BNSF Railway Company operate on lots adjacent to the Argentine Neighborhood. *Id.* at ¶¶ 8–9, 19, 21. Miles Leasing Company owns a vacant lot on 42nd Street, just west of the neighborhood, and BNSF operates the Argentine Railyard directly to the north. *Id.* Defendant Unified Government of Wyandotte County and Kansas City, Kansas, is the municipal government entity that oversees permitting and the neighborhood's stormwater infrastructure. *Id.* at ¶¶ 10, 23, 34.

Sometime before the summer floods, Miles Leasing removed trees and other brush from its vacant lot and part of BNSF's property, Doc. 140 at ¶ 35, depositing that debris around the vacant lot, Doc. 174 at ¶ 23. According to a report commissioned by the Unified Government (the Benesch Memo),[2] the debris obstructed a drainage ditch bordering the vacant lot and diverted water from the four rainstorms into the neighborhood. Doc. 209 at 4. The diverted water crossed 42nd Street north of Argentine Boulevard, flowed east across a commercial property, and pooled at Plaintiffs' properties at the north end of 38th Street. *Id.* at 5–6.

Additional flooding occurred further east into the neighborhood. Doc. 209 at 8. During the four storms, the area surrounding 24th Street and Strong Avenue experienced "minor flooding." *Id.* The Benesch Memo indicates two possible causes: overwhelmed sewer system inlets or a closed storm gate that reduced stormwater capacity.

---

[1] All references to the parties' briefs and filings are to the page numbers assigned by CM/ECF.

[2] Plaintiffs rely on the Benesch Memo in support of their motion. Doc. 226 at 6 n.2; Doc. 243 at 2.

3

*Id.* at 9–10. Whatever the cause, the Benesch Memo concludes that the eastern flooding could not have contributed to flooding west of 37th Street. *Id.* at 10; *see also* Doc. 238-8 at 4–5 (Depo. of Jim Fisher) (testifying that flooding by the pump station could not have affected properties from 42nd to 38th Streets).

Plaintiffs all live between 40th and 38th Streets north of Argentine Boulevard. Plaintiffs Macias and Garcia own a home on 39th Street. Doc. 140 at ¶ 1. Their home flooded during each of the four storms. Doc. 238-3 at 8, 10–11, 13, 14. In each, water rose to between hip and chest height and flowed from west to east. *Id.* at 9, 13–15, 18. During the floods, Macias and Garcia evacuated south to the corner of 39th Street and Argentine Boulevard, where they were safely out of the flood waters. *Id.* at 9, 11; Doc. 238-6 at 8–9. Macias observed that the flood waters did not cross Argentine Boulevard during the first two floods. Doc. 238-3 at 9, 11. From her observation, the flooding affected homes from 40th Street to 38th Street, and she did not know of anyone south of Argentine Boulevard that experienced flooding. *Id.* at 13. Macias has not experienced any additional flooding after the final August 2017 flood. *Id.* at 15.

Plaintiff Zamora resides on 38th Street, Doc. 140 at ¶ 2, and experienced varying degrees of flooding during the first, second, and fourth floods, Doc. 238-4 at 7–8, 10–12. Zamora experienced mild basement flooding during the first storm, damaging some ductwork, *id.* at 8; basement and garage flooding during the second storm, *id.* at 10; and significant flooding in her basement and some flooding on the first floor of her home during the fourth, *id.* at 12. She did not experience flooding or damage during the third storm. *Id.* at 11. Zamora parked her vehicle at the intersection of 38th Street and Argentine Boulevard during the first flood to remove it from standing water. *Id.* at 6. During the second, she moved her car almost a block past Argentine Boulevard on 38th Street. *Id.* at 9. And during the third or fourth floods, Zamora moved her car once again to 38th Street and Argentine Boulevard. *Id.* at 11. She chose this location because, from her experience, it does not flood as badly south of Argentine Boulevard. *Id.* at 7. And even though Zamora moved her car just beyond Argentine Boulevard on at least one occasion, she described the water level as resembling "puddle[s]" rather than a measurable depth. *Id.* at 17–18. Like Macias, Zamora observed that the water at her home rose to about hip height for each flood and on at least two occasions flowed from west to east. *Id.* at 8, 10–12, 17.

4

Plaintiff Curry resides on 38th Street, Doc. 140 at ¶ 6, and experienced flood damage during all four flood events, Doc. 238-7 at 9, 13–15, 18. On each occasion, Curry observed the flood waters flowing from west to east, *id.* at 11, 14, 16, 18, and he retreated to the corner of 38th Street and Argentine Boulevard, *id.* at 10, 14–15, 18. During the third flood, Curry observed standing flood waters from 39th to 37th Streets and suggested that there was no flooding on either 36th or 35th Streets. *Id.* at 17. The deepest part of the flood was at the north end of 38th, and depth became shallower south toward Argentine Boulevard. *Id.* Curry testified that there was water south of Argentine Boulevard, but that it was inches, not feet. *Id.*

Plaintiff Schneider also resides on 38th Street. Doc. 140 at ¶ 3. Schneider was not home when her house flooded the first time. Doc. 238-5 at 10. She was home during the second flood and observed water rushing east from 40th Street toward her home. *Id.* at 11. She evacuated and drove her car to the corner of 38th Street and Argentine Boulevard. *Id.* From that vantage point, Schneider observed the water flow east on Argentine Boulevard and sharply turn north on 38th Street toward the back of her property. *Id.* at 12. She observed the same water flow for the third and fourth floods and evacuated to the same location. *Id.* at 13. Schneider testified that Argentine Boulevard was a typical location for her and her neighbors to park their cars because "it doesn't flood there." *Id.* at 18. Indeed, Schneider stated that flood waters never crossed south over Argentine Boulevard during any of the four flood events. *Id.*

No Plaintiff experienced additional flooding after the fourth storm. Doc. 238-3 at 15 (Macias); Doc. 238-4 at 6 (Zamora); 238-5 at 16 (Schneider); *see* Doc. 238-6 at 14 (Garcia) (testifying that there were no additional floods after remedial measures to the creek, despite "a lot of rain after that"); Doc. 238-7 at 4 (Curry) (explaining that he moved from his 38th Street residence in late-August to mid-September 2017). Plaintiffs allege that Defendants cleared the debris from the creek in response to their complaints. Doc. 140 at ¶ 55.

### C

Plaintiffs allege a putative class under Rule 23. They seek to represent a class of "[a]ny and/or all owner/occupants, renters, and/or residents of residential property" between 42nd Street and 34th Street, south of the BNSF Argentine Railyard and north of approximately 500 feet south of Strong Avenue, from June 1, 2016, to the

present. Doc. 140 at ¶ 66. This geographic range encompasses about 30 residential blocks. *See* Doc. 238 at 20.

Each Plaintiff seeks to recover $900,000 in damages. Doc. 140 at ¶ 97. This figure covers, among other things, "medical damages, future medical damages, costs to remediate any affected property, medical monitoring, loss of use and enjoyment, [and] punitive damages." Doc. 238-18 at 7. Notably, Plaintiffs do not compute how those damages reach $900,000 for each putative class member. *See id.* Plaintiffs claim their putative class meets each Rule 23(a) prerequisite and satisfies Rule 23(b)(2) and (3) as either a class seeking injunctive relief or a class posing common questions of law and fact. Doc. 226 at 8, 18–19.

Defendants oppose certification. They argue that the proposed class is overbroad because it includes a substantial number of individuals that could not have been harmed by Defendants' alleged conduct. Doc. 238 at 18–22. They also dispute that Plaintiffs meet the Rule 23(a) prerequisites. They argue that joinder of a relatively small number of neighbors is not impracticable; questions of liability are not common because Defendants' alleged conduct affected some potential class members and not others; Plaintiffs' claims are not typical of putative class members whose injuries were allegedly caused by separate conduct; and Plaintiffs are not adequate representatives of the class, nor is their proposed class counsel adequate. *Id.* at 22–36. Defendants further argue that the proposed class does not qualify under Rule 23(b)(2) because Plaintiffs fail to demonstrate their need for injunctive relief. *Id.* at 36–39. The proposed class also does not qualify under Rule 23(b)(3), Defendants argue, because common questions of law or fact are not predominant, nor is a class action the superior method for adjudication. *Id.* at 39–43.

## II

Plaintiffs' motion to certify a class is denied. The class definition is fatally overbroad, as the evidence presented shows a large majority of class members in the proposed geographic range could not have been affected by Defendants' alleged conduct. And a reformed class that excludes those putative class members fails to satisfy Rule 23(a)'s numerosity requirement.

### A

Plaintiffs seek to certify a class of all residents of the Argentine Neighborhood within a 30-block area. Doc. 140 at ¶ 66; Doc. 226 at 7. Defendants argue that Plaintiffs' evidence establishes that only three of those 30 blocks could have been affected by Defendants' alleged conduct and thus the class is overbroad and should not be certified. Doc. 238 at 14–16. Because the proposed class contains many individuals that could not have been harmed by Defendants' alleged conduct, Plaintiff's proposed class fails for overbreadth.

A class definition is too broad for certification if it "include[s] a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012).[3] There is no definitive guidance on how many uninjured members constitutes a "great number," but the Seventh Circuit instructs that "too many" is "a matter of degree, and will turn on the facts as they appear from case to case." *Id.* at 825–26 (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (denying certification where "millions" of putative class members could not have shown damages proximate to defendant's alleged conduct)); *see also Riffey v. Rauner*, No. 10-02477, 2016 WL 3165725, at *4 (N.D. Ill. June 7, 2016) (holding that 65% of a putative class that could not have been injured was a "great many"), *rev'd on other grounds*, 138 S. Ct. 2708 (2018). *But see, e.g.*, *Messner*, 669 F.3d at 824 (holding that a 2.4% decrease in class size did not justify denial of certification); *In re EpiPen*, 2020 WL 1180550, at *35 (holding that 5% did not defeat certification). Where a class's overbreadth is minor, the appropriate course is to amend the class to correct the issue rather than deny certification entirely. *Messner*, 669 F.3d at 826 n.15.

---

[3] The Tenth Circuit has not addressed whether the presence of uninjured putative class members defeats certification, but the District of Kansas has applied *Messner* on at least three occasions. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Prac. & Antitrust Litig.*, No. 17-2785, 2020 WL 1180550, at *31–32 (D. Kan. Mar. 10, 2020) (predicting that the Tenth Circuit would follow *Messner* if presented with the issue); *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-2591, 2016 WL 5371856, at *4 (D. Kan. Mar. 10, 2016); *In re Urethane Antitrust Litig.*, No. 14-1616, 2013 WL 2097346, at *2 (D. Kan. May 15, 2013), *aff'd*, 768 F.3d 1245 (10th Cir. 2014).

Defendants argue that the proposed class must fail because it is both temporally and geographically overbroad. Doc. 238 at 18–22. They first argue that the class's temporal range, from June 1, 2016, to the present, would include persons who left the neighborhood prior to or arrived after the four floods in July and August of 2017. *Id.* at 19–20. Although that temporal range would appear to include uninjured individuals, there is no showing as to how many or what proportion of the proposed class falls into this category. As a result, it is unknown whether the class includes a "great number" of uninjured plaintiffs that were not present for the floods. *See Messner*, 669 F.3d at 824.

Nonetheless, Defendants demonstrate, based on Plaintiffs' evidence, that their alleged conduct could not have injured a wide swath of the proposed class area.[4] Doc. 238 at 20–22. Plaintiffs rely on the Benesch Memo to support the proposed class area, *see* Doc. 243 at 7, but that Memo establishes only that three blocks of the proposed class area were affected by Defendants' alleged conduct. According to the Memo, water was diverted from the Miles Leasing property, flowing east across a commercial lot and into Plaintiffs' properties. Doc. 209 at 6. From west to east, those waters affected 42nd Street to 38th Street. Doc. 209 at 4–5. Of those streets, only 40th to 38th Streets appear to be residential. *See* Doc. 238 at 22. The Argentine Neighborhood grades down from south to north, flattening north of Argentine Boulevard, Doc. 243-7, so the water flowed to a low spot at the north end of 38th Street and eventually subsided into the drainage creek. Doc. 209 at 6; *see also* Doc. 243-7; Doc. 238-5 at 12; Doc. 238-7 at 17. The Benesch Memo concludes that water pooled between the drainage creek that separates the neighborhood from the BNSF yard in the north and Argentine Boulevard to the south, affecting only two square blocks. *See* Doc. 238-7 at 5–6.

Plaintiffs' own testimony is consistent with the Benesch Memo and only minimally adds to its scope. Each Plaintiff observed water flowing from west to east during the floods. And Plaintiffs removed their cars to Argentine Boulevard to escape the flood waters. The only additional evidence is Curry's testimony that during the third

---

[4] The following discussion probes the merits of Plaintiffs' claims insofar as it is necessary to decide the motion for class certification. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). It says nothing of the ultimate merits of Plaintiffs' claims.

flood he saw water pooled as far east as 37th Street and that water rose slightly south of Argentine Boulevard, but only by inches. Doc. 238-7 at 17.

Whatever the exact boundaries of the flood waters within those parameters, it is clear that residents within up to 90 percent of Plaintiffs' proposed class area could not have been affected by the floods. The class area includes nearly three additional residential blocks uphill from Argentine Boulevard. *See* Doc. 238 at 20. There is no evidence that individuals beyond the Argentine Boulevard high-water mark could have been affected by Defendants' alleged conduct. Similarly, Plaintiffs present no evidence that the floodwaters stretched east of 37th Street. Instead, the evidence shows that the floods affected three to four blocks, representing only 10 to 15 percent of the proposed class area and leaving 85 to 90 percent of the class area unaffected. There are a "great number" of putative class members that could not have been affected by Defendants' alleged conduct. *See Messner*, 669 F.3d at 824–26. And because this is not a minor case of overbreadth, Plaintiffs' motion to certify the class as is fails. *See id.* at 824; *In re EpiPen*, 2020 WL 1180550, at *35.

Plaintiffs argue that the Benesch Memo is not the only source of support for their proposed class area, directing attention to an expert report by Larry Schall. *E.g.*, Doc. 243 at 2.[5] Schall's report contains his opinion as to the causes and extent of the four floods in the Argentine Neighborhood. Schall's report is neither timely, nor does it aid Plaintiffs' argument that the proposed class area is appropriate.

Schall's report is not timely. To start, Plaintiffs only present Schall's report in their reply brief. Arguments made for the first time on reply are not considered. *See, e.g.*, *United States v. Mannie*, 971 F.3d 1145, 1158 n.19 (10th Cir. 2020); *Walter v. Smith*, No. 21-1073, 2022 WL 17612048, at *4 n.5 (D. Kan. Dec. 13, 2022).

---

[5] In the course of briefing, Defendants moved to strike any reference in Plaintiffs' reply brief to Larry Schall's report or stigma damages. Doc. 244. That motion is granted as to Larry Schall's report for the reasons that follow. Plaintiffs' references to stigma damages are disregarded, as they have no bearing on numerosity, which is the subsequent basis on which Plaintiffs' motion fails. *See* Section II.B., *infra*.

9

But there is another, more serious timing issue. Schall's report was not timely disclosed for purposes of class certification. A party must disclose its expert testimony "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). An expert disclosure that fails to comply with a scheduling order may be excluded from evidence. *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 895 (10th Cir. 2006).

The parties' second amended scheduling order required them to meet and confer regarding any expert opinion they intended to offer in support of a class certification motion and contact the Court for formal disclosure deadlines. Doc. 139 at 1. It is not clear what that formal deadline was,[6] but in any event, the order imposed a deadline of November 20, 2020, for any motion to exclude expert testimony. Doc. 139 at 1–2. In September 2020, Plaintiffs served a designation of experts on Defendants that contained three CVs of potential experts but no signed opinions or reports. Doc. 170. This designation did not include Schall. *See generally id.* After a flurry of motions regarding the designation, Plaintiffs withdrew their designation in its entirety, and class discovery closed without extension. *See* Doc. 179; Doc. 195; Doc. 203 at 1. In February 2021, Plaintiffs served on Defendants an Amended Designation of Experts and Disclosures, identifying Larry Schall as an expert witness for the first time and including his report. Doc. 223. In a hearing the next day, Plaintiffs' counsel represented that Schall was "a merit-based expert" concerning liability, "which is not at issue in [the] class certification process."[7] Doc. 228 at 25–26. Defendants challenged whether the disclosure was truly "amended," since the operative disclosure had been withdrawn, and sought an extension to address Plaintiffs' new disclosure. *Id.* at 46. That request was granted, permitting Defendants to respond *after* resolution of this motion to certify. Doc 227 at 20.

---

[6] Defendants claim that Plaintiffs never conferred with them regarding Schall or contacted the Court for a formal disclosure deadline. Doc. 245 at 6. Plaintiffs do not identify a formal deadline, nor do they argue that they met one. *See generally* Doc. 248.

[7] The transcript of the hearing refers to "Mr. Shaw." *See* Doc. 228 at 24. Given the context of the parties' discussion, "Mr. Shaw" appears to be a reference to Larry Schall. *Compare* Doc. 243 at 3 *with* Doc. 228 at 24.

Plaintiffs make two arguments why their untimely expert designation should nonetheless be considered for this motion. Neither is persuasive. First, they argue that the purpose of Rule 26(a)(2) permits use of Schall's report at this stage because, according to Plaintiffs, the purpose of the rule is to provide notice of expert testimony prior to trial. Doc. 248 at 2. If the rule were so permissive, any disclosure occurring any time before trial would be appropriate. The text of the rule precludes that conclusion: "A party must make [expert] disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Whatever the formal deadline was for expert disclosure, Plaintiffs filed their new designation three months after expiration of the scheduling order's express deadline for filing motions to exclude expert testimony. Plaintiffs' designation could not have been timely, and Schall's report was expressly disclaimed as being offered in support of class certification issues. The designation and report thus may be excluded for failing to comply with the scheduling order. *See Sims*, 469 F.3d at 895.

Second, Plaintiffs argue that Defendants failed to object to Schall's report and the Magistrate Judge never explicitly precluded reliance on Schall's opinion at the class certification stage. Doc. 248 at 3–4. But Plaintiffs never gave notice that they would rely on Schall's report for class purposes. In fact, Plaintiffs' counsel represented that they would not do so, explaining that Schall's opinion went only to liability, which was "not at issue in [the] class certification process." Doc. 228 at 25–26. Moreover, Defendants were instructed that they did not need to object to the report until after resolution of the class certification motion. Doc. 227 at 20. That indicates that Schall's report was viewed by everyone as a designation for merits discovery, not class discovery.

Even if disclosure of Schall's report were timely, it still does not support the wider geographic scope that Plaintiffs seek. Like the Benesch Memo, Schall found that the contours of the neighborhood decline in elevation from south to north. Doc. 223 at 3. He states that the flooding at issue occurred "within th[e] flat area to the north," and opines that the flooding from the Miles Leasing property crossed 42nd Street "down into the Argentine northwest area." *Id.* at 3–4. The only new information Schall provides is his opinion that certain pump stations operated by the Kaw Valley Drainage District failed to close, leading to backups in the combined sewer system. *Id.* at 5. But Schall concludes that the backups "contribut[ed] to the flooding of

11

the properties *adjacent to the BNSF railway stormwater drainage ditch* running along the south side of the railway tracks." Doc. 223-7 at 5. Those properties he is describing are within the northern boundary of the affected area established by the Benesch Memo. *See* Doc. 238 at 22. In short, nothing in the Schall report justifies the breadth of Plaintiffs' proposed class beyond what is established by the Benesch Memo.

### B

Even if Plaintiffs' proposed class were narrowed to include only those living in the affected area when the floods occurred, it would fail under Rule 23(a). Plaintiffs contend that their proposed class meets the numerosity requirement found in Rule 23(a)(1). Doc. 226 at 8–11. Defendants argue numerosity is lacking because Plaintiffs have failed to demonstrate that joinder of putative class members would be impracticable. Doc. 238 at 16–19. Because Plaintiffs have not shown that joinder would be impracticable, their motion fails. *See Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

A class action is proper only if the putative class is so numerous that it would be impracticable to join all members in a single action. Fed. R. Civ. P. 26(a)(1). In addition to promoting efficiency, the numerosity requirement safeguards individual due process rights, balancing the presumption that an individual has a due process right to press his or her own claim with the challenges of adjudicating numerous similar claims. 1 *Newberg & Rubenstein on Class Actions* § 3:11 (6th ed.). A plaintiff seeking class certification therefore must justify why joining individual claims is impracticable under the circumstances, meriting class-wide action. *See id.*

Impracticability is not impossibility—a plaintiff need only show that joinder would be "extremely difficult or inconvenient." *Newberg* § 3:14 (citation omitted). Determining whether joinder is impracticable is a "fact-specific inquiry that considers the nature of the action, the size of the proposed class, the location or geographic dispersion of class members, and whether members' names are easily ascertainable." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (citation omitted). And because Rule 23 is more than a pleading standard, Plaintiffs' arguments for numerosity must be supported by evidence to warrant class certification. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

There is no magic number of putative class members that automatically satisfies the numerosity requirement. *Trevizo*, 455 F.3d at 1162. What is important is the totality of circumstances that accompany the putative class size. For example, in *Trevizo*, the Tenth Circuit affirmed a District Court's refusal to certify an 84-member class. *Id.* Although the class size "was not insignificant," the District Court found that that number was not prohibitive of joinder because each member could be identified and located. *Id.* By contrast, in *Horn v. Associated Wholesale Grocers, Inc.*, 55 F.3d 270 (10th Cir. 1977), the Tenth Circuit reversed a denial of certification where the class numbered 46 members. *Id.* at 275. Although the plaintiffs were identifiable, the injunctive relief they sought—compliance with civil rights laws—would also apply to any future unknown plaintiffs. *Id.* Under those circumstances, "where the relief sought [wa]s injunctive and declaratory," the court held that "even speculative and conclusory representations as to the size of the class [were] sufficient." *Id.*

Under the circumstances of this case, Plaintiffs have not shown that joinder is impracticable. Plaintiffs make four arguments to show that the numerosity requirement is met. Doc. 226 at 9–11. Each fails.

*First*, Plaintiffs argue that their proposed class exceeds the size of other classes that courts have certified. Doc. 226 at 9. But numerosity is not determined by numbers alone. *Trevizo,* 455 F.3d at 1162. It is true that courts have certified classes as few as 17 to 20 persons, Doc. 226 at 8–9 (citing *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)), but that determination must not be based merely on numbers but "on the particular circumstances of the case," *Rex*, 585 F.2d at 436; *see also Abercrombie & Fitch Co.*, 765 F.3d at 1215 (listing relevant circumstances). And "the duty of establishing those particular circumstances rests with the party who asserts the existence of the class." *Rex*, 585 F.2d at 436.

But even if numbers could be sufficient, Plaintiffs fail to identify how many members they believe are in the proposed class. *See* Doc. 226 at 9–10. Plaintiffs say "[t]here are dozens, if not hundreds of residents" that were affected by Defendants' conduct. That is curious on a number of levels. For one thing, the difference between dozens and hundreds is potentially significant: dozens may be fewer than fifty; hundreds may be 500 or more. This is relevant to determining whether Plaintiffs can establish that joinder of individual claims is impracticable. For another, it seems unlikely that hundreds of people would live in three blocks consisting of single-family homes. Put

13

simply, Plaintiffs fail to show how their class size makes joinder impracticable because they point to no evidence that would establish a reasonable estimate of the number of class members involved. *Rex*, 585 F.2d at 436.

*Second*, it appears that Plaintiffs argue that joinder would be impossible because there are future unknown plaintiffs. Doc. 226 at 10. Plaintiffs contend that joinder of the class members is impracticable "because their number changes every day as Defendants assess new debts." *Id.* But Plaintiffs never alleged an ongoing debt assessment practice or any other ongoing practice of the Defendants. *See generally* Doc. 140. Nor do they articulate injunctive relief to cease one. *See id.* at 29–30. There is no evidentiary basis to believe that there is a future stream of unidentified plaintiffs. Indeed, the circumstances suggest that the affected class members are identifiable: the floods occurred on four discrete days, affecting a fixed number of residents in a small geographic range. Plaintiffs do not show how the identities of the individuals who lived in those affected residences on those days could not be discovered. Whatever that possibility, Plaintiffs fail to show that there is a future stream of unknown plaintiffs or unspecified assessments that would make joinder impracticable.

*Third*, Plaintiffs argue that "the vast majority of potential plaintiffs lack the resources to bring separate lawsuits." Doc. 226 at 10. Plaintiffs rely on three non-binding district court opinions to support their contention. Each is distinguishable from this case.

Plaintiffs first cite *Colorado Cross-Disability Coalition v. Taco Bell*, which found joinder impracticable because over a quarter of the proposed class (of more than 2,000 individuals) lived below the poverty level and could not sustain individual suits. 184 F.R.D. 354, 359 (D. Colo. 1999). Key to that decision was that the plaintiffs brought claims for which "no attorney fees [we]re recoverable and the most an individual member could obtain in damages under th[e] statute [wa]s $500." *Id.* The plaintiffs in that case provided evidence to establish their financial hardship. *See id.* But here, Plaintiffs are not pursuing low-dollar claims: they are seeking $900,000 for each "affected person" in the class in a limited area. Doc. 238-18 at 7. Plaintiffs claim that the class members, who they describe as "the most marginalized and economically disadvantaged members of the community" would be unable to obtain counsel, Doc. 226 at 10, but they do not show how their claims for substantial damages would fail to attract counsel. Even so, Plaintiffs have offered no evidence of the

economic hardship borne by the putative class members that would make joinder impracticable. Without that, Plaintiffs' argument fails. *See Comcast*, 569 U.S. at 33.

Plaintiffs' remaining two citations are inapposite. Doc. 226 at 10 (first citing *Jackson v. Foley*, 156 F.R.D. 538, 541–42 (E.D.N.Y. 1994), and then citing *Sherman v. Griepentrog*, 775 F. Supp. 1383, 1389 (D. Nev. 1991)). In both cases, the ability of a plaintiff to bring a claim was coupled with other circumstances that would have independently made joinder impracticable. For example, *Jackson* identified the existence of unknown future plaintiffs in determining the alleged class satisfied numerosity. 156 F.R.D. at 542. So too *Sherman*. 775 F. Supp. at 1389 ("[T]he joinder of unknown future individuals is inherently impracticable." (citation omitted)). That circumstance is not present here because the residents in the affected area are known or knowable. And neither case otherwise addresses the weight given to individual ability to bring suit standing alone.

*Fourth*, Plaintiffs argue that individual suits by all the putative members "would result in duplicative discovery . . ., repeated adjudication of similar controversies . . . (with the resultant risk of inconsistent judgments), and excessive costs for everyone involved." Doc. 226 at 11 (citing *Harlow v. Sprint Nextel Corp.*, 254 F.R.D. 418, 423 (D. Kan. 2008)). Plaintiffs frame the issue as a choice between proceeding as a class action and trying each case individually. But that dichotomy misses the focus of Rule 23(a)(1). *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 235 (4th Cir. 2021) (instructing the district court to consider "whether judicial economy favors *either* a class action *or* joinder); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 259 (3d Cir. 2016) ("[Numerosity] factors are only relevant to a binary choice at the certification stage: a class action versus joinder of all interested parties. At this point, we do *not* consider the possibility that plaintiffs may bring individual suits."). Joinder, too, serves judicial economy. If that is impracticable, Plaintiffs must show how.

Plaintiffs' reliance on *Harlow*'s discussion of the inefficiency of individual suits is misplaced. *Contra* Doc. 226 at 11. In *Harlow*, the court found that proceeding as a class was superior to the cost, inefficiency, and unnecessary duplicity of individual suits. 254 F.R.D. at 423. But essential to that conclusion was the fact that joinder was impracticable because the class consisted of hundreds of individuals who resided in seven states and the District of Columbia, ranging from coast to coast. *Id.* at 424. Denying certification thus would have

required plaintiffs to bring individual suits in multiple jurisdictions, generating the harms the court sought to avoid. That is not the case here. All class members live in the same neighborhood and press the same claims against the same defendants in the same jurisdiction. Plaintiffs must show that joinder is impracticable under the circumstances. They have not done so.

### III

For the foregoing reasons, Plaintiffs' motion to certify a class, Doc. 226, is DENIED, and Defendants' motion to strike, Doc. 244, is GRANTED in part and DENIED in part.

It is so ordered.

Date:  May 11, 2023                      s/ Toby Crouse
                                               Toby Crouse
                                               United States District Judge